Our fourth case for today is United States v. Edward Boliaux. Mr. Gable. Good morning, Your Honors. Mr. Chapman, my name is Andrew Gable and I represent the U.S. Department of Justice, and I'm here to talk to you today about the case of Mr. Gable. He was sentenced to four years in prison for wire fraud and bank fraud, and the government brought a lot of allegations against him. It was complicated, but if you get down below just the allegations, you'll see that there's some gaps in the evidence. We understand the high burden for any sufficiency of evidence challenge. However, here, it was more that there were some missing elements. Some of these were the lack of the wire fraud, as well as nobody from the banks testifying that any check-kiting or bank fraud existed. Why does that matter if the bank records were put in evidence and an expert testified that this set of transactions was a check-kiting operation? Then there was no victim to say that they were defrauded or that this was not allowed or not permitted? I don't understand that. If there's a series of insufficient fund checks creating a phony appearance of bank accounts that indeed have enough money to cover checks, the banks that are the issuers of the checks that are creating that impression are potentially liable to make those checks good. I believe the government's own experts said just writing an insufficient check is not illegal. That's not what happened here, though. This was a much more elaborate scheme. It's not like some college kid, of course nobody writes checks anymore, but some college kid overdrew the account and said, oops, sorry mom. This is a very sophisticated arrangement. It was sophisticated and complicated, but I still believe it was appropriate for the bank to come in and say this is not allowed. Why? What law requires the victim of a crime to come in and testify? I believe they just have to have somebody to establish the fact that a crime occurred. Well, that's a separate question. You're saying that in order to prove the crime, the victim has to come in and talk about the loss. First of all, there doesn't even have to be a loss in bank fraud. It could be an intended loss. But do you have any case that says that the victim has to come in and testify about that? I was unable to find any case dealing with that. Because, of course, if that were true, there would never be a murder prosecution. It's somewhat different because they can still use circumstantial evidence. Here there's only bank records. In a murder case, they always have to show that there was a crime. But the victim doesn't have to show it himself. Someone has to be able to show it. The government didn't just stand up there and make an opening statement and say, by the way, jury, we're hoping that you'll find that there was a check-kiting scheme. They introduced evidence and there was an explanation about how this check-kiting scheme went forward. And the expert testified that the check-kiting scheme resulted in a temporary loss to each financial institution. Why isn't that sufficient? He also testified. First, I'd like to thank the government. They did point out to me in my reply brief, I incorrectly stated that Wolverton, the expert, said that Mr. Beaulieu was a perpetrator and the actuality was perpetrated. I'd like to thank Mr. Chapman for pointing that out to me. But to your point, Your Honor, the expert never even spoke to anyone from the banks. All he did was take a look at bank records. It doesn't matter. Based on his expertise in this area, and he was a qualified expert to testify, he told the jury and they were free to take it or leave it based upon all of the evidence and the witness himself and his testimony. But he testified that the check-kitting scheme resulted in a temporary loss to each financial institution. And a loss of $60,000 for an actual loss for a few days. However, I believe having any kind of actual loss does not necessarily show a fraud, though. No, I agree with that. But what Judge Smith is saying is, why does the government have a burden greater than amassing the bank records, getting an expert to look at them, analyze how these checks were flowing from institution A to B to C to D to E, whatever number we get up to, and say, in my experience, this is a check-kitting scheme. Because no one from the bank was able to come in and say this was not allowed, that this was a fraud? It's not up to the bank to tell the district court what the law is, whether it's allowed or not. The expert describes what happened. The district judge makes a decision about whether that's sufficient under the law to go to the jury. The district judge said it was. And the jury instructions told the jury what was illegal and what wasn't. It's not up to somebody from the bank to do that. It's our business that without that testimony, there's nothing to show that the bank, there wasn't permission. This wouldn't be illegal if the bank allowed people to write insufficient checks. Oh, but that's just preposterous, I have to say. What was going on here, these amounts of money and the timing of the checks, that there's more than just a simple, oops, insufficient funds check here. But we only have that from the expert, nobody from the bank. And it may be a very low hurdle. I think maybe you need to move on to another point. The other issue somewhat related to that was they only used the expert with the bank fraud. The fact is using the expert witness, Mr. Brinkhat, who also worked at AFC, which was one of the lenders. And he was allowed to testify as an expert witness, but also be able to give fact testimony. But the government said we're not going to use him as a fact witness. I thought in a sense you won that point at the district court, and he just testifies as an expert. But he also testified as a fact witness, though, that AFC does not allow double floor planning. And he also adds, nobody I know of allows double floor. In the industry, double floor planning isn't cool. But the issue, though, is once he testified like that, he became a fact witness. So you're saying the fact that he said AFC does not allow double floor planning, that alone made him a fact witness? Is that what the basis of your argument is? That is one of the bases, yes. What else is it that you claim he testified to that made him a fact witness? It gets a little more complicated when he also talked about one of the competitors, DCS, also not allowing double floor planning. But why isn't that expert testimony? It is expert, but it's also somewhat fact testimony. How is that somewhat fact testimony? He's basing that on his own personal knowledge at the time in dealing with that company. Didn't he testify that he was basing that on his expertise in the area? That is what he testified to, but my view is that he's more of a hybrid witness. You can't untangle these two. But you would say that all the time about any industry witness whose expertise derived from experience in an industry as opposed to what field did you get your PhD in. I mean, when you have Kumho Tire-type experiential experts, naturally they're going to apply the factual experience they have in an industry when they talk about industry practices. Essentially he's saying in this industry they don't like you to sell the same car twice, which at least have the title out there using the same car twice as security without disclosing to the second lender that they actually are in a pretty unsecured position. I think with his situation, though, but he's not just an expert coming in saying this is what happens in the industry. He's an expert who's coming in and saying I worked for this company, the alleged victim here, at this time. And to say we did not allow double floor planning opens it up to be able to cross-examine him as a fact witness. And again, one of the issues here is... What would you have asked that you didn't ask anyway? I did not represent Mr. Beaulieu at the trial court. Or what would somebody have asked, not you in particular. More about who dealt with Mr. Beaulieu, what was said to him about this contract. Why is that relevant instead of just saying, you know, what company would want to be told you have a security interest in car, vehicle identification number, whatever it is, and they wouldn't find it material to know that that car has already been pledged to somebody else, so they're second in line, and their security interest is worth exactly zero. With these lenders, though, they had a security interest in everything. Everything on the line, all the cars. I know that they're inventory security interests, too, but this floor planning stuff is more specific. The record shows it's vehicle by vehicle. There was some conflicting testimony about that. However, the lenders never put a lien on any specific vehicle, and the vehicle that this case is all about, the Silverado, AFC never had that car was never double floor planned with them, but yet they still assert an interest in that car. That's the car that was subject to all these orders from the state court that were being ignored. Yeah, that was the main car, but AFC never double floor planned that car, but yet they say we have an interest in that car because we have an interest in everything. But EMC had provided the financing for that car, so EMC did have an interest in it. Whether it was double floored or not, they had an interest in it, and then it was sold to somebody else. I don't believe AFC ever gave any money for that car for the Chevy Silverado. I believe it was Mannheim who may have given them the financing for that car. But AFC still asserts an interest in that car because they have an interest, one, through the court order, and two, in anything that EMC, the car lot, or Mr. Beaulieu has personally. Let me suggest that before you sit down for your rebuttal, you talk for a minute about why we ought to look at this as 17 or so different schemes instead of just 17 ways of accomplishing the one scheme for the wire and mail fraud. There's a couple of reasons. One is with this whole check-kiting. They allege it in Count 1 as part of the scheme, but then they allege it again in Counts 5 through 10. To me, that suggests these are two separate things. But there's no objection made in a timely manner in the district court to the indictment on grounds of multiplicity or anything else. No, Your Honor. We've fussed about what that word ought to be in the criminal rules. And the district court expressly found waiver. Right. Unlike some recent cases in this circuit where the violation of Rule 12b wasn't raised in the district court, this time it was, and waiver was found. So how could we reach this issue at all? For the duplicity issue, more it comes in through the jury instructions. Yes, but Rule says it has to be raised before trial and can't be raised later with the exception of good cause shown. You haven't argued that there was good cause for raising it later. In fact, you essentially ignored the district court's waiver finding. So you've got a problem. For the duplicity argument, that was more to distinguish it from the Daniel decision about why this case is different. I agree there was no argument that pretrial or even in our briefs argued that this should be thrown out for duplicity. Well, there are two options. You can raise it before trial or you can show that there was good cause for not raising it before trial. But as I read your brief, you don't say it was raised before trial and you don't argue that there was good cause for not raising it before trial. That combination looks fatal. The Rule is pretty clear about what happens if there's no good cause. I understand, Your Honor. The duplicity argument was more to illustrate the necessity of a unanimity instruction. So I think we're talking about two things here, multiplicity and duplicity. You admit that you did not raise multiplicity arguments below and the district court specifically found waiver. Is that correct? The multiplicity, not the duplicity, but multiplicity. It was not raised below. Okay, and the district court found waiver on that. The duplicity, you're trying to argue that you raised that through your proposed defendant's jury instruction on unanimity. Yes, Your Honor. But you didn't argue duplicity in advance as a basis to dismiss the indictment or sever part of the indictment, did you? No, Your Honor. And in proposing this defendant's version of the jury instruction on unanimity, you didn't argue one of the basis for that instruction should be duplicity. You're just asking us to implicitly find that there was a duplicity argument in there. Is that correct? It was not raised at all below. The duplicity argument that we're putting forward is more to illustrate the need for the unanimity instruction. As for the multiplicity, we do recognize that there is the waiver. We did cite to the Lockett case. And we have one minute left. And with that, the multiplicity was just more count five, alleged a whole list of all these check hidings, all these different checks, and then count six through ten, just realleged those exact same checks. Okay, thank you. Thank you, Your Honor. Mr. Chapman. May it please the Court. My name is Timothy Chapman, and I represent the United States. The evidence that was presented at trial was more than sufficient to support all of the defendant's convictions. That includes the wire fraud convictions as well as the bank fraud convictions based on the check-hiding operation.  I think it's important to note that this is a case where the government was not required to present any victims from the banks. The expert testimony that was presented... But why did you choose an expert from one of the involved companies? Wouldn't it have been much cleaner? I mean, there has to be more than one expert about bank, about check-hiding in the greater Chicago area. You know, Mr. Brincat? Are we talking about the check-hiding expert, Your Honor? I'm sorry, right, the check-hiding expert. But why have somebody who's related to the company? So the expert on the check-hiding activity was Randall Wolverton from the FBI. That's Wolverton, yeah, right. And he had previously testified, and this Court upheld his testimony in the Yoon decision. The simple answer is Brincat was the double-floor plan. Yeah, Brincat's the double-floor plan. But Wolverton, I mean, just because he's testified... Again, you start out with this messiness about whether he's going to be both a fact and an expert. And then you drop the fact part, right? With regard to Mr. Brincat, yes, we did. Brincat, okay, that's what he said. And he worked for AFC, one of the victims here. He did. Mr. Brincat. So I think the question is why did the government put an expert witness on who worked for one of the victims? Well, we felt, I think, that he could very clearly articulate the fact that this was not condoned behavior throughout the industry. How big an industry is this, though? Are these the only two? There's a handful, Judge. There's a handful of big players. AFC is a mid-sized player. Nexgear Capital is a very large player. And there are a few others as well. So, in other words, there might have been other people you could have found as an industry expert. I guess theoretically, Judge, that's true. Theoretically? It's not theoretical. I always say theoretically, Your Honor, because I never spoke with other individuals, so I didn't ever take the steps to call anybody else. But weren't you courting trouble by having somebody who was potentially a fact witness? Not necessarily, Judge, because if we're not calling him as a fact witness, his expert opinion is certainly subject to attack and cross-examination. And he did not, contrary to what the defense says, respectfully, he did not testify as a fact witness. All he said is no lender, no floor plan lender in this industry is going to allow double floor planning or engage in double floor planning because it makes their secured interest very insecure. And by keeping him to that, there was no discussion about any involvement Mr. Brinkhap may have had with Mr. Beaulieu. Did he testify about AFC's practices in particular? He did a little bit, Judge. Would that make him become a fact witness since he's testifying about AFC, which he has personal knowledge of? I don't think so because he's testifying about AFC's general approach to these things. There's always the theoretical possibility that AFC made an exception for Mr. Beaulieu or something along those lines. This was to give the jury a framework in which to analyze all of the evidence that it was receiving in terms of Beaulieu's behavior and why they would not engage in it. Had he ever worked for any other company? He had worked for several other companies. This was the first floor plan lender that he worked at. So what he knows about AFC comes from his working at AFC. Well, he testified it's broader than that. He keeps up on journals. He keeps in touch with competitors. There are a lot of ways people in this industry interact with other people in the industry and keep track of what's going on. Are they reporting to the antitrust division? Yes, I'm thinking that maybe this is another problem. I did not ask him that question. I believe there is a line in The Wealth of Nations about competitors scarcely getting down to lunch without their thoughts turning to restraints of trade. And the other thing, Judge, in terms of any impairment of the defense's ability, they could have called him back as a fact witness. They simply elected not to do so. Wouldn't it have been too late for them to have designated him as a fact witness on their list? Surely the government would have objected if they'd all of a sudden popped a fact witness on you. We do, but we've also found that that objection largely goes unheeded and defense attorneys are left out. But that's not much of a response, it seems to me. Well, look, if he had relevant fact testimony and the defense wanted to put him on, I probably wouldn't have objected to it. I had a pretty sound understanding of everything he knew about Mr. Bolio and the case. So as a matter of just trial strategy, I might have been unhappy that they sprung it on me at the last minute, but if they had done it, they probably wouldn't have been involved. And you would have objected, and you might have had a work-to-rule judge who might have said, I really mean it when I have a list of witnesses that I ask for from both sides. Sure. The other thing about that testimony is, in a sense, it hurts us. I think, to get maybe to Judge Easterbrook's point, I probably should have called somebody from a different company if for no other reason that given that he was an AFC employee and AFC was one of the victims, the jury could have inferred bias based on that fact alone. So in some sense, he's not the strongest expert to lead with. But that basic point, it's also true that that basic point, that double floor planning is not condoned in the industry, was brought out by the activity in this case and by the behavior of the floor plan lenders. So is double floor planning even possible if you don't also have the aspect of this arrangement where they went to the Illinois Secretary of State and got all the duplicate titles? No, you'd have to lie to get a duplicate title or create a... So you have to have the duplicate title before you can do double floor planning, is that right? Absolutely. The testimony was that each floor plan lender, when they give an advance on a vehicle, they want to hold the original title. That's their collateral. That's their primary security in getting repaid. And when Bolio would buy a car, say, at an auction, and he would give the title over to the first lender and get one advance, in order to get a second... Does the record show why the state was willing to issue all these duplicate titles? We asked Ms. Ballard... This being what it is, one might suspect bachiche at that point. It does, Your Honor, actually. We asked Ms. Ballard the basic question whether the Illinois Secretary of State investigates the applications. So in this case, the applications... Losing one title is carelessness. Just as a regular matter, applying for duplicate titles just screams fraud. I completely agree with you. And yet the Illinois Secretary keeps issuing these. Well... And in terms of it screaming fraud, it's even worse in this case because the application said that the title had been lost. But, of course, Bolio knows that the title is with the first lender. So he's actually lying explicitly in that application. And when the Secretary of State gets these, I believe Ms. Ballard's testimony was that they process about 13,000 title applications a day at the Secretary of State, and that they do not investigate the legitimacy of each application document. As long as the boxes are checked, the fee is paid, and it appears on its face to be legitimate. And they don't have, apparently, any system of checking whether one person is making an implausible number of claims. Not during the processing stage. They do have the equivalent of an inspector general that if there is a later allegation of fraud, complaints can be made to that law enforcement entity, and they'll investigate problems with titles. But I think the general working presumption is that people just won't engage in this, that people act legitimately, and they process the paperwork. I'm stunned that they process them quickly enough  Yeah, I think like a lot of agencies, they're running on fairly slim budgets, and they have resource constraints, and they do the best they can with the people they have. With regard to the unanimity instruction, the district court properly rejected that. The indictment on its face very clearly alleges a single scheme with 17 different means, and the case along the circuit is consistent and clear that the government does not need to prove unanimity with respect to any particular means, simply that the elements were met. And in this case, the judge properly instructed the jury with regard to the elements of wire fraud and also with regard to the bank fraud. Mr. Chapman, you've charged a very broad scheme here. How is the sale of the Silverado related to the double floor planning here? So the Silverado was a piece of EMC property, and because of that, the two lenders, AFC and DSC, had a secured interest in it. To clarify a point that was brought up earlier, neither of those lenders actually provided an advance on the Silverado, but it was EMC property. It was an inventory lien? What was the nature of that? It arises from the general contract that each of the lenders has with EMC, and that provision provides that they have an interest in pretty much all of EMC's assets to ensure repayment. So it's a backup lien, basically. That's right, and so what happened when AFC initiated their replevant action in Will County, they seized all the cars and a lot. That included several that they had financed, but also several that they had not financed. And that vehicle in particular was one of the vehicles that Bolio, using connections at the storage location, took back into his possession. So the Will County Circuit Court then told Bolio, who was a defendant in the replevant action, that he could not dispose of that vehicle without notice to AFC, and without holding the proceeds in trust so that they could litigate whether AFC had a right to those proceeds. And Bolio then creates Joliet Motors, and he sells the vehicle. He converts it through Joliet Motors. So Joliet Motors is a continuation of the scheme because it's concealing multiple types of assets. It's concealing EMC's assets, including future receivables for vehicles that were sold under EMC. And it's also concealing Bolio's interest. And it's an installment sale, right? So not only does he not give the money back to the property, pay it into the lawyer's trust account, and that's how you get into the wire fraud, right? Correct. Through Pennsylvania. Right, when he converts the vehicle, he causes all of those wires to occur over time. Each of those wires that were charged was initiated at the business, at the Joliet Motors business itself. There was some reference to Glenview Capital in them, but that money would originally come into Bolio's hands in Joliet Motors and be processed by that business. Some of it may have gone to Glenview Capital or not. But because those proceeds are for the vehicle that he converted, the lenders would have had a secured interest in those or some kind of legal interest in those proceeds just as they did in the vehicle itself. Not because they financed it, but because they had a lien on all of EMC's property. Yeah, they had a secured interest in all of EMC's property. That's correct. And so, obviously, the money that comes in from the conversion of that vehicle keeps Joliet Motors in business, which in turn is helping shield Bolio's assets individually and the corporate assets of EMC from the floor plan creditors. So unless there are any other questions for me, we ask that the convictions be affirmed. Thank you. I'll give you a minute, Mr. Gable. I think you were down at the bottom of the barrel. With that Silverado they're talking about, that was paid to Glenview Capital. It was never paid to Joliet Motors, and it was never paid to Edwards Bolio. It's a separate company, and there was no evidence about where Glenview Capital was processing these payments or that those went across state lines. And as for the AFC issue, the government actually had somebody from AFC testify, but that person never said anything about double floor planning. They had somebody from DSC testify, but they also didn't say anything about double floor planning. The only evidence about this double floor planning being illegal or improper came through their expert. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.